## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE | ) | |
| DENNIS BARTEL, | ) | |
| DEBTOR | ) | CHAPTER 7 |
| _____ | ) | CASE NO. 05-13134-JBR |
| | ) | |
| COMMONWEALTH OF | ) | |
| MASSACHUSETTS, | ) | |
| ALEXANDRA ACARDI, M.D., and | ) | |
| BRIAN A. KENNY, M.D. | ) | |
| | ) | |
| Plaintiffs | ) | |
| v. | ) | AP. NO. 07-01019 |
| | ) | (consolidated with A.P. N.O. |
| | ) | 07-01018) |
| DENNIS BARTEL | ) | |
| | ) | |
| Defendant | ) | |

<u>MEMORANDUM OF DECISION</u>

This matter came before the Court for trial on the Complaints filed by the

Commonwealth of Massachusetts, Alexandra Acardi, M.D., and Brian A. Kenny, M.D.

("the Plaintiffs"), objecting to the discharge of the Debtor, Dennis Bartel, pursuant to 11

USC § 727(a) of the Bankruptcy Code.  On March 13, 2007, the Court consolidated these

two matters for trial. *See* Docket 441.   Having considered the testimony, exhibits,

demeanor, and credibility of witnesses, the following constitutes the Court's findings of

fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure

7052.

## **Commonwealth's Count I & Acardi and Kenny's Counts III[1] and IV[2] - Transfer and Concealment of Assets (11 USC § 727(a)(2))**

The Plaintiffs object to the Debtor's discharge pursuant to section 727(a)(2).  A court must liberally construe discharge exceptions in favor of the debtor and strictly against the objecting party in order to preserve the "fresh start" goal of bankruptcy relief. *See In re Burgess*, 955 F.2d 134 (1st Cir. 1992).  To prevail on a § 727(a)(2) claim, the Plaintiffs must demonstrate by a preponderance of the evidence that the Debtor (1) transferred, removed, destroyed or concealed  (2) his property (within the one year period before the petition date) *or* property of the estate (after the filing of the petition) (3) with the actual intent to hinder, delay, or defraud a creditor.  *See Razzaboni v. Schifano (In re Schifano)*, 378 F.3d 60, 66-67 (1st Cir. 2004).

Because a debtor is unlikely to admit that his intent was fraudulent, the Court may infer actual intent from circumstantial evidence. *See Devers v. Bank of Sheridan (In re Devers)*, 759 F.2d 751, 754 (9th Cir. 1985).  The following objective indicia, when taken together, permit an inference of actual intent: (a) the lack or inadequacy of consideration; (b) the family, friendship or close relationship between the parties; (c) the retention of possession, benefit or use of the property in question; (d) the financial condition of the party charged, both before and after the transaction at issue; (e) the cumulative effect of the series of transactions or course of conduct after the incurring the debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (f) the general

---

[1]On January 13, 2009, the Court severed all counts under 11 USC § 523 as well as the count under a piercing of the corporate veil theory and only heard counts under 11 USC § 727 at trial. *See* Docket 96.  In Count I  and Count II of their Complaint, Plaintiffs Acardi and Kenny sought to hold the Debtor liable for debts owed to New Dimensions Construction, LLC ("New Dimensions") under a piercing the corporate veil theory and alleged that the Debtor's obligations are non-dischargeable pursuant to 11 USC § 523(a)(2)(A), respectively; both counts were severed.

[2] In their Complaint, the Plaintiffs Acardi and Kenny delineated their section 727(a)(2) claim as two separate Counts, III and IV, to correspond with subsections 727(a)(2)(A) and 727(a)(2)(B), respectively.

chronology of the events and transactions under inquiry.  *See Groman v. Watman (In re Watman)*, 301 F.3d 3, 8 (1st Cir. 2002); *Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1582-83 (2d Cir. 1983).

In the present case, the Plaintiffs complain of two sets of transfers: those made pre-petition and those made post-petition.  The Court first addresses its findings with respect to pre-petition transfers and then the post-petition transfers.

In the one-year period immediately preceding the filing of his bankruptcy petition, the Debtor's wife transferred at least $11,288 from their joint account to the joint account of Rene and Lynn DesLauriers; both accounts are at the Taunton Federal Credit Union. The testimony and evidence adduced at trial indicates that there were at least fourteen such withdrawals, ranging anywhere from $305.00 to $4,000.  Because a withdrawal from a bank account satisfies the definition of a transfer, there is no question as to transfer. *See 6* COLLIER ON BANKRUPTCY ¶ 727.02 (15th  rev. ed. 2009) (citing *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279 (9th Cir. 1996)).

As a result, the issue before the Court is whether the Debtor transferred these monies with the intent to hinder, delay, or defraud a creditor.  Because Mr. DesLaurier was the Debtor's business partner and because Mrs. DesLaurier is Mrs. Bartel's best friend "since high school," there is undoubtedly a close relationship between the parties. However, the Court finds that the Plaintiffs failed to satisfy their burden of proof with respect to these pre-petition transfers for several reasons.  First, the Plaintiffs failed to demonstrate these transfers were without consideration.  Both Mrs. DesLauriers and Mrs. Bartel testified that these transfers represented "personal loans," which were usually taken to "help each other" pay for day-to-day shopping expenses.  Second, any benefit

3

that the Bartels' retained as a result of these transfers was temporary at best because these "loans" were repaid promptly.  In fact, the Debtor's banking records reflected routine transfers from the DesLauriers' joint account to the Bartels joint account, and vice versa; therefore, the evidence corroborates Mrs. Bartel's and Mrs. DesLauriers's testimony. *See* Pl.'s Exs. 9 - 16.  The Plaintiffs make much of the fact that, during a deposition on December 12, 2006, Mrs. Bartel expressed "doubt" as to transfers over $1,000 between her and Mrs. DesLauriers.  Even though the evidence indicates that Mrs. Bartel transferred $4,000 to the DesLauriers' account on December 29, 2004, the Plaintiffs fail to note that there was a corresponding $4,000 deposit into the Bartels' account on December 16, 2004.  *See* Pl.'s Ex. 22.  While the Court agrees that these transfers are unusual (and perhaps ill-advised), there is insufficient evidence to find that the Debtor retained possession of these monies.  Third, there is no evidence that these transactions changed the Debtor's financial condition or even had an effect on the Debtor's bankruptcy.  To the contrary, both women testified that to the best of their knowledge, the balance between them was zero.  Moreover, both Mrs. Bartel and Mrs. DesLauriers testified that such transfer activity is presumably traceable to when they first opened their respective accounts at the Taunton Federal Credit Union (over fifteen years ago). Because these transfers were a "normal and ordinary" course of their lives, they do not permit an inference of fraudulent intent.

In addition to the pre-petition transfers, the Plaintiffs allege that a $72,000 "deposit transfer" into the Debtor's personal account on April 21, 2005, only eight days after the Debtor filed for bankruptcy and the Debtor's actions in connection therewith, was a concealment of property.  *See* Pl.'s Ex. 16.  By his own admission, the Debtor

never reported the receipt of these funds to the Chapter 13 Trustee, his creditors, or the Court; thus, there is no question that he concealed the deposit of the $72,000 into his account.[3]  Of this amount, the Plaintiffs allege that the Debtor then transferred $64,900 with the intent to hinder, delay, or defraud a creditor.

Like the pre-petition transfers, the Debtor conceded that the $72,000 "deposit transfer" came directly from the DesLauriers' account.  As a threshold matter, before assessing actual intent, the Court must determine whether these monies were the Debtor's property.  Despite the Debtor's assertion that the money was for the benefit of his company, DB & Sons Builders Inc. ("DB & Sons"), the Court cannot ignore that the transfer was made into the Debtor's personal account and not into DB & Sons' business account at the Crescent Credit Union.  *See infra* discussion regarding the third factor (finding that the Debtor also retained some of the transferred money for personal use).  Even if it accepts the Debtor's argument that the transfer into his personal account was an innocent mistake, the Court notes that the Debtor was in Chapter 13 as of the transfer date.  Any property the "debtor acquires after the commencement of the case but before . . . conver[sion] to a case under chapter 7" is property of the estate.  *See* 11 USC § 1306; *see also In re Drew*, 325 B.R. 765, 770 (Bankr. N.D. Ill. 2005) (finding that property the Debtor acquired post-petition, such as refinancing proceeds, was property of the estate).  Accordingly, the Court finds that $72,000 transfer was property of the estate.

The remaining issue before the Court is whether the Debtor's transfer of the $64,900 out of his personal account was made with the actual intent to hinder, delay or defraud a creditor.  For the following reasons, the Court concludes that the answer is yes.

---

[3] To the extent that the Plaintiffs believe that the transfer into the Debtor's account was made with the intent to hinder, delay, or defraud a creditor, the argument is fruitless since the "deposit transfer" only increased the value of the property of the estate.

- Of the six factors courts use to assess intent, the sixth (i.e., the general chronology of the events and transactions under inquiry) is by far the most compelling in the instant case.  Specifically, the Debtor's inconsistent explanations require the Court to engage in a guessing game as to the real purpose of the $72,000 "deposit transfer."

- On at least three separate occasions, the Debtor provided conflicting accounts for the transfer including that it was a loan, then a gift, and, at some later point, a capital contribution by Mr. DesLauriers into their business.

- During a deposition by the Commonwealth, the Debtor first testified that the he and his wife personally borrowed the $72,000 from the DesLauriers.  *See* Pl.'s Ex. 17. When subsequently questioned about his failure to report the transfer on his bankruptcy petition or to the Chapter 13 Trustee, the Debtor indicated that the $72,000 was a business loan to DB & Sons.  There was no written loan agreement or other documentation to support this contention.

- During a deposition by Acardi and Kenny, the Debtor flatly denied that the DesLauriers loaned the $72,000 to DB & Sons.  *See* Pl.'s Ex. 18. Instead, he claimed that the money "was a gift to" his wife, who in turn loaned it to DB & Sons.

- To further confuse matters, the Debtor provided yet another explanation in his Answer to Interrogatories of the Commonwealth.  *See* Pl.'s Ex. 19.  Without any written agreements to support his assertion, the Debtor claimed that, as a "friend and former business partner," Mr. DesLauriers "agreed to contribute capital to the corporation."  *See id.*

- Additionally, the third factor (i.e., the retention of possession, benefit, or use of the property in question) supports a finding for actual intent to hinder, delay or defraud a

6

creditor. Despite his contention that the $72,000 was "only for DB & Sons," the evidence demonstrated that the Debtor retained possession, benefit, and use of at least a portion of the $72,000.

- By his own testimony, the Debtor acknowledged that he retained possession of at least $7,100 of the $72,000 transfer for himself.  The Debtor explained that this was the "balance [DB & Sons] owed" him for "back pay."  Without any evidence of an arrearage on DB & Sons' books or the frequency of payroll disbursements, the Debtor's bare explanation lacks credulity.

- The Debtor's insistence that he did not use any of the $64,900 for personal expenses despite evidence to the contrary is rather troubling.

- The evidence demonstrates that the Debtor used at least $5,513 of the funds for expenses incurred as a result of his personal bankruptcy.  He used $3,013 to make plan payments to the Chapter 13 Trustee, and another $2,500 to pay his attorney. *See* Pl.'s Ex. 20.  Notably, both checks were dated April 21, 2005, the *same day* he received the $72,000 deposit.  *See id.*  Because his personal account reflected a closing balance of only $2,773 as of April 20, 2005, it appears that the Debtor could not satisfy these obligations without dipping into the purported "loan" to DB & Sons. *See* Pl.'s Ex. 16. In fact, after reviewing his account statement at trial, the Debtor conceded that he "temporarily borrowed [money] from the" DB & Sons' "loan."

- After retaining $7,100 for back-pay allegedly owed by DB & Sons and using another $5,513 for bankruptcy expenses, approximately $59,379 remained of the initial

$72,000 deposit transfer.[4]

- The Debtor testified that he used the remaining $59,379 of the transferred funds for DB & Sons' business related matters.  Of that amount, he transferred $51,479 to the DB & Sons account at Crescent Credit Union via a bank check dated April 21, 2005. *See* Pl.'s Ex. 20.

- The Debtor failed to explain why he did not transfer the full amount of the alleged "loan" to DB & Sons.  Nor could he explain why he made business related payments from his personal account in spite of the $51,479 transfer to the business account.

- With the remaining $7,900[5], the Debtor paid $4,000 to Attorney Raphael and $3,900 to Suburban Insulation.  *See* Pl.'s Ex. 20.  Dated April 21, 2005, both bank checks reflect a payment on behalf of "DB & Sons Builders Inc."  *See id.*  While the Suburban Insulation payment may have been for services provided to DB & Sons, the same cannot be definitely said for the entire payment to Attorney Raphel.  The Debtor testified that Attorney Raphel provided legal services not only for DB & Sons but also for him personally; some unspecified portion of the $4,000 payment may have been for personal services for the Debtor.

- Finally, the fourth factor (i.e., the financial condition of the party charged, both before and after the transaction at issue) compels the conclusion that the monies were transferred with the actual intent to hinder, delay, or defraud a creditor as the Debtor's financial condition was unquestionably of ill health.

In summary, after receiving the $72,000, the Debtor transferred a portion of the

---

[4] The Court notes that the difference of $8 was accounted for by "bank check fees" for five bank checks that were drawn on the Debtor's Taunton Federal Credit Union account on April 21, 2005.  *See* Pl.'s Ex. 20.

[5] This was the difference between the $59,379, which remained after the Debtor retained "back pay" and paid his personal bankruptcy expenses, and the $51,479 that he transferred to DB & Sons.

money to a DB & Sons account as well as to other unsecured, non-priority third party

creditors.  The Debtor's inconsistent and often ambiguous testimony severely

undermined his credibility; the Court cannot take on the task of attempting to untangle his

web of inconsistent testimony.  The Debtor's failure to disclose any of the transfer to the

Chapter 13 Trustee only underscores his actual intent to hinder, delay, or defraud his

creditors.  Consequently, judgment will enter for the Commonwealth on Count I and for

Acardi and Kenny on Counts III and IV; the Debtor's discharge will be denied.

## Commonwealth's Count II & Acardi and Kenny's Count V[6] – False Oath (11 USC § 727(a)(4)(A))

Section 727(a)(4)(A) of the Bankruptcy Code provides that the Court shall deny a

debtor a discharge if he "knowingly and fraudulently . . . made a false oath or account."

The Plaintiffs must prove by a preponderance of the evidence, *see Grogan v. Garner*, 498

U.S. 279, 287 (1991), that (1) the Debtor made a statement under oath, (2) the statement

was false, (3) the Debtor knew the statement was false, (4) the Debtor made the statement

with fraudulent intent, and (5) the statement was material to the bankruptcy case. Once it

appears that the oath is false, the burden shifts to the Debtor to refute the evidence.

Where a debtor knows the truth and nonetheless willfully and intentionally swears

to a false statement, he makes a knowing and fraudulent oath. *See Gordon v. Mukerjee*

*(In re Mukerjee)*, 98 B.R. 627, 629 (Bankr. D.N.H. 1989).  At trial, the Debtor

acknowledged that he reviewed and signed his initial Chapter 13 bankruptcy petition,

related schedules and the Statement of Financial Affairs ("SOFA"), under the penalty of

perjury, which is equivalent to verification under oath.  Further, there is no question that

---

[6] In their Complaint, the Plaintiffs Acardi and Kenny denoted their claims pursuant to 11 USC § 727(a)(3) and 11 USC § 727(a)(4)(A) as Count V.  Due to the fact that the latter claim appears after the former claim, the Court notes that the Plaintiffs made a typographical error by also numbering their subsection (a)(4)(A) claim as Count V.

the Debtor's statements, as discussed below, were false and that he knew they were false.

Debtor asserts that he disclosed all pertinent facts to his former bankruptcy attorney and

that the subsequent failure to make the challenged disclosures was due to advice of

counsel.  While it is true that a debtor who relies on his attorney's advice may lack the

requisite intent required to deny discharge, such reliance must be made "in good faith."

*See First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir. 1986).

Moreover, "the advice of counsel is not a defense when it is transparently plain" that the

alleged omissions "should be scheduled."  *See In re Mascolo*, 505 F.2d 274, 277 n.4 (1st

Cir. 1974) (citing 1A J. Moore & J. Mulder, COLLIER ON BANKRUPTCY, ¶ 1423, n. 10

(King ed. 1974)).  The Debtor did not claim that he had forgotten about the challenged

omissions or that he had not realized that disclosure was necessary at the time of filing.

Instead, he testified that he "discussed, in detail, every single aspect of every schedule"

with his attorney before signing anything.  Because the Debtor has the "paramount duty

to consider all questions posed" and ensure that each answer is "complete in all respects,"

the Court cannot conclude that his reliance on and subsequent failure to question

counsel's advice was in good faith.  *See Friedman v. Sofro (In re Sofro)*, 110 B.R. 989,

991 (Bankr. S.D. Fla. 1990).

     It is also indisputable that the Debtor's omissions were material to the bankruptcy

proceeding.  The very essence of the Bankruptcy Code is to ensure that complete,

truthful, and reliable information is available at the outset of the proceedings.  *See In re*

*Mascolo*, 505 F.2d at 278. Section 727(a)(4)(A) seeks to ensure that a Debtor does not

play fast and loose with his assets or with the reality of his affairs.  *See Boroff v. Tully (In*

*re Tully)*, 818 F.2d 106, 110 (B.A.P. 1st Cir. 1987).  As such, a fact is material when it

relates to a debtor's business transactions or concerns the discovery of assets, business

dealings, or the existence and disposition of the debtor's property. *See Distrib. Corp. of*

*New England v. Zicaro (In re Zicaro)*, 2009 WL 1795302 at *1 (Bankr. D. Mass. June 22,

2009) (citing *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984)).

Here, the Debtor not only failed to accurately answer certain questions on Schedule B

and the SOFA, but he also made inconsistent statements regarding his assets during his

Rule 2004 examination.  First, his Schedule B does not properly identify personal

property such as his actual ownership interest in New Dimensions Construction, LLC

("New Dimensions") and a personal bank account.  Second, with erroneous figures for

annual gross income and omissions such as a second mortgage and pending lawsuits, the

Debtor's SOFA is hardly a complete and accurate snapshot of his financial condition.

Lastly, his contention that he neither commingled nor transferred assets between personal

and business accounts despite evidence to the contrary is anything but credible.  The

Debtor's testimony corroborated these inaccuracies and omissions; however, he noted

that the bankruptcy petition was prepared in haste due to the threat of foreclosure.  Even

if haste could excuse these inaccuracies and omissions, the Court cannot ignore the fact

that the Debtor never amended his schedules or the SOFA.  Not only does the cumulative

effect of these falsehoods suggest that the Debtor tried to play fast and loose with the

reality of his financial affairs, but it also inhibited creditors' ability to ascertain the full

scope of his income and assets.  Thus, the omissions and inaccuracies are material.

   As a result, the remaining issue before the Court is a narrow one: whether the

Debtor's false oath was made with a fraudulent intent, warranting a denial of his

discharge pursuant to section 727(a)(2)(A).  "The successful functioning of the

bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." *In re Mascolo*, 505 F.2d at 278.  Neither the trustee nor the creditors should be required to engage in a "laborious tug-of war to drag the simple truth into the glare of daylight." *See In re Tabiban*, 289 F.2d 793, 797 (2d Cir. 1961).  In fact, discharge is a privilege reserved for debtors who fulfill their unconditional, absolute obligation to make full disclosure of all matters relevant to the administration of the estate.  As a result, this Court has routinely held that a showing of a reckless disregard for the truth satisfies the fraudulent intent requirement.  *See, e.g., In re Zicaro*, 2009 WL 1795302 at *2; *see also In re Tully*, 818 F.2d at 110.  While ignorant or inadvertent omissions are not indicative of such intent, the statute requires no more than an intentional falsehood in a material matter*. See Schreiber v. Emerson (In re Emerson)*, 244 B.R. 1, 28 (Bankr. D.N.H. 1999). Consequently, reckless disregard may be inferred from circumstantial evidence, such as the cumulative effect of a series of seemingly innocent mistakes.  *See In re Zicaro*, 2009 WL 1795302 at *2.  Lastly, the Court must consider not only the omissions in the Debtor's schedules but also his financial sophistication. *See id.*

Applying the foregoing principles to this case, the Court finds that the Plaintiffs satisfied their burden of proof that the Debtor made the false statements with a fraudulent intent.

- As a majority owner and manager of New Dimensions, a general contracting business for residential properties, the Debtor is undoubtedly a person with more than a marginal level of business experience and sophistication.

- Despite his own testimony and substantial evidence to the contrary, the Debtor failed

to report *any* gross income for 2003 and 2004 on his SOFA.[7]  The Debtor testified, and his wife corroborated, that he received his 2003 and 2004 salary from New Dimensions. The Debtor and his wife also indicated that he received his 2005 salary from DB & Sons. While Mrs. Bartel testified that she sometimes had "small" jobs, she acknowledged that she never retained permanent employment and that any income she earned during the 2003 through 2005 time period was minimal. Thus, the Court finds that the Debtor was the sole breadwinner in the Bartel household.

▪ Although Mrs. Bartel testified that her husband typically deposited his earnings into their joint account at the Taunton Federal Credit Union, he "did not always deposit everything in there."  Because the Debtor would sometimes "bring home cash" and at other times "cash the check before he came home," Mrs. Bartel did not know what the Debtor's salary was.

▪ By his own admission, the Debtor indicated that he prepared and was responsible for maintaining New Dimensions' bookkeeping records.  At trial, the Debtor even verified several deposits and withdrawals reflected on the 2003 Ledger, including checks denoted as "pay" to the order of "[D]ennis [B]artel." *See* Pl.'s Ex. 24.

▪ In fact, in January 2003 alone, the Debtor earned approximately $10,950 (of which only $1,400 was attributable to additional work performed on weekends).  Moreover, the evidence disclosed that he received regular paychecks totaling at least $72,325 from New Dimensions in 2003. *See* Pl.'s Ex. 24.  Reporting a gross income of $0 for 2003 in spite of the Debtor's own testimony that he "often" received a weekly salary of $1,750 evidences, at a minimum, a reckless disregard for the truth.

---

[7] The Plaintiffs make much of the fact that the Debtor's failed to disclose any gross income for 2005 on the SOFA. Notably, however, the only evidence presented of income in 2005 was post-petition (June – July 2005).

- Additionally, the Debtor testified to receiving eleven bank checks from New Dimensions in 2003.  Totaling each check made payable to the Debtor demonstrates that the Debtor transferred at least $109,325 from New Dimensions' North Easton Savings Bank Account into his personal Taunton Federal Credit Union Account.  Due to the fact that these checks, whether viewed individually or in the aggregate, were not of inconsequential value, the Court finds that the Debtor omitted these monies from the SOFA for the express purpose of avoiding the consequences of full disclosure.

- Notably, the Debtor claimed an adjusted gross income of $4,669 on his 2003 federal income tax return, which he prepared. In explaining the difference between the tax return and the SOFA, he notes that he "thought" his gross income "after deductions" was zero. Because the Debtor maintained the books and records of New Dimensions and prepared his own tax return, the Court finds his alleged understanding (or lack thereof) of the elementary term "gross income" to be questionable.

- The Debtor's failure to disclose his 2004 gross income on the SOFA reveals a mental process replete with subtleties and distinctions, all aimed in a direction opposite to full disclosure.

- The Debtor testified that the New Dimensions' ledger, which he maintained, properly reflected any paychecks he received in 2004.  Indeed, the 2004 Ledger revealed that he received at least $45,980 over the six month period, from February 12, 2004 through August 12, 2004. *See* Pl.'s Ex. 25. Yet, he acknowledged that he did not report anything on the SOFA.

- Furthermore, on his 2004 federal and state income tax return, the Debtor reported an

adjusted gross income of $83,220. *See* Pl.'s Ex. 31. To explain the discrepancy between the SOFA and the 2004 tax return, the Debtor testified that, at the time he signed his bankruptcy petition, he "did not know" his 2004 income. Notably, however, his federal return was dated April 14, 2005 (only one day after his petition date) and his state return was dated April 13, 2005 (the very same day as his petition date). Thus, the Debtor's signed tax returns undermine his own testimony.

- The Debtor's failure to properly report his ownership interest in New Dimensions further demonstrates his disregard for the truth.  At trial, the Debtor testified that he held a 98% ownership interest and that each of his two partners, Rene DeLauriers and Gregg Guillemette, held a 1% interest in the company.  However, his Schedule B reflects a 60% interest.

- The Debtor attributes this discrepancy to his "belief" that he owned a 60% interest in the company even though he (and his partners) agreed to a different partnership agreement at some unspecified time prior to the filing of his bankruptcy petition.  Not only was he aware of the modified agreement but he failed to consult it to ensure the accuracy of his petition.

- Furthermore, the Debtor acknowledged that Mr. Guillemette resigned from and presumably gave up his ownership interest in New Dimensions on February 11, 2005, nearly two months before the Debtor filed his bankruptcy petition.  As a result, the only other individual with an interest in the company was Mr. DesLauriers.  While the Debtor conceded that his belief was "mistaken," he never amended his Schedule B to reflect the accurate ownership interest.

- The Debtor's failure to report a bank account at Plymouth Savings Bank (the

"Plymouth account") as a personal account on Schedule B was hardly an innocent mistake. The evidence indicates that this account was in existence as early as April 2004, almost one year before the April 13, 2005 petition date. Because the SOFA does not reflect this account as closed and since there is no evidence to the contrary, the Court infers that the account was still open when the Debtor filed for bankruptcy.

▪ At trial, the Debtor testified that he did not report the Plymouth account on Schedule B because he used it for business related matters. Notably, however, he indicated that the account was a personal account at a deposition on December 5, 2006. As such, the Debtor's inconsistent testimony further undermines his credibility.

▪ Moreover, the Plymouth account statement disclosed various check-card debits including payables to "Family Suites" in Orlando, FL and to "Six Flags" in Agawam, MA. *See* Pl.'s Ex. 40. Even if the payable to "Family Suites" could arguably be business related, the same cannot hold true for the debit for "Six Flags." Consequently, the Debtor's failure to disclose the Plymouth account as a personal account on the SOFA underscores his fraudulent intent because had he been successful, the Trustee would not be able to investigate that account for non-exempt property or avoidable transactions or transfers.

▪ By not disclosing any lawsuits to which he was party, the Debtor failed to fulfill his duty of complete disclosure.  Because the Court finds the Debtor to be of at least average intelligence, it is incontrovertible that he understands the plain meaning of the word lawsuit.  By his own admission, he provided his attorney with "all the pertinent information," including "lawsuits" filed against him and New Dimensions. While he contends that he "specifically review[ed]" question 4(a) of the SOFA, he

neither questioned nor brought the omission to his attorney's attention.  The Court
concludes that this omission was hardly inadvertent and that the Debtor's reliance on
his attorney's advice was not in good faith.

▪ Additionally, the Debtor's omission of any previous addresses on the SOFA reveals
his disregard of one of the fundamental requirements of discharge: full, honest, and
complete disclosure of all details and circumstances even if the value and relevance to
the case may not be of great significance.

▪ The Debtor's failure to amend his petition, schedules, and SOFA confirms the fact
that he did not disclose his assets with the requisite spirit of candor that is essential to
the integrity of the bankruptcy process.

▪ The Debtor's argument that he was unable to amend his petition, schedules, and
SOFA because the Commonwealth seized his books and records on February 26,
2006 is nothing but disingenuous.  The Court infers that the Debtor retained
possession of all the necessary documents to prepare the bankruptcy petition in April
2005 because, by his own testimony, he "disclosed all pertinent information" to his
attorney.  While the Court gives credence to the suggestion that the petition was
prepared in haste, it cannot ignore the Debtor's testimony that he conducted a page-
by-page review of the draft petition, schedules and statements.  Despite such a
thorough review, the Debtor never cogently or persuasively explained his failure to
identify these patent errors.

▪ Lastly, the Debtor's repeated claim that he asked his attorney to amend the petition
but was "not sure" if any such amendments were actually made is suspect. Even if
attorney oversight could explain the Debtor's failure to amend, the Court cannot

ignore the fact that he sought the benefit of the homestead exemption in April 2006

(nearly a year after his petition date).  While he was well within his rights to offer

such an amendment, the Debtor made no effort to make any unfavorable amendments

in order to correct any of these errors.  Because the Debtor's attorney could not

amend the petition without obtaining the facts from the Debtor, and indeed the

Debtor's verification of these amendments, such a willingness to offer a favorable

amendment while making no unfavorable ones evidences the Debtor's disregard for

full and complete disclosure and the truth.

In summary, the Court finds that the cumulative series of omissions and inaccuracies

were made with the intent to hinder, delay, and defraud creditors. Accordingly, judgment

will enter for the Commonwealth on Count II and for Acardi and Kenny on Count V; the

Debtor's discharge will be denied.

## Commonwealth's Count III & Acardi and Kenny's Count V[8] – Failure to Preserve Books or Records (11 USC § 727(a)(3))

The Plaintiffs object to the Debtor's discharge pursuant to section 727(a)(3).

Section 727(a)(3) provides that the Court shall deny the Debtor a discharge if he

"concealed, destroyed, mutilated, or failed to keep or preserve any recorded information,

including books, documents, records, and papers, from which [his] financial condition or

business transactions might be ascertained" unless the circumstances of the case justify

such act or failure to act.  Because section 727 makes complete financial disclosure a

condition precedent to the privilege of discharge, a debtor must provide dependable

information on which a creditor can rely in tracing the debtor's financial history.  *See*

---

[8] In their Complaint dated January 15, 2007, the Plaintiffs Acardi and Kenny denoted their claims pursuant to 11 USC § 727(a)(3) and 11 USC § 727(a)(4)(A) as Count V.  Due to the fact that the latter claim appears after the former claim, the Court notes that the Plaintiffs made a typographical error by also numbering their subsection (a)(4)(A) claim as Count V.

*Canha v. Gubellini (In re Gubellini)*, 2009 WL 604953, at * 1 (Bankr. D. Mass. 2009).  A

creditor need not organize and reconstruct a debtor's business affairs; instead, the debtor

has the duty to maintain and retain comprehensible records.  *See Krohin v. Fromman (In*

*re Frommann)*, 153 B.R. 113, 117-18 (Bankr. E.D.N.Y. 1993).

Initially, the Plaintiffs must prove, by a preponderance of the evidence, that: (i)

the Debtor concealed, destroyed, mutilated, falsified, or failed to keep or preserve any

recorded information; and (ii) that the recorded information was that from which the

Debtor's financial condition or business transactions might be ascertained.  If the

Plaintiffs prove "these two elements, the burden shifts to the debtor to demonstrate that

such act or failure to act was justified under the circumstances."  *See Lassman v. Hegarty*

*(In re Hegarty)*, 400 B.R. 332, 342 (Bankr. D. Mass. 2008).

There is no question that the Debtor not only destroyed but failed to preserve his

financial information.  At trial, both the Debtor and his wife testified that Mrs. Bartel

maintained the family books and records.  She testified that she reconciled all bank

accounts on a monthly basis, after which she routinely 'threw away" the statements.

After further questioning, Mrs. Bartel indicated that, even after the Debtor filed for

bankruptcy, she saw "no need" for retaining these statements.  Furthermore, there was no

evidence of any records that Mrs. Bartel actually maintained as part of her monthly

reconciliation process.

As the result, the issue before the Court is whether the Plaintiffs satisfied their

burden of proof that the Debtor failed to provide adequate documentation from which the

Plaintiffs could reasonably ascertain the Debtor's financial condition.  For the following

reasons, the Court finds that the answer to this question is yes.

- Despite the Debtor's insistence that he never commingled or transferred assets between his personal accounts and the New Dimensions' business account, the evidence and testimony adduced at trial demonstrates otherwise.

- Over the five-month period, May 2003 through October 2003, the Debtor transferred at least $109,325 from New Dimensions' account at Easton Savings bank into his personal account (which was held jointly with his wife) at the Taunton Federal Credit Union.  Not only were these monies drawn in the form of bank checks made payable to the Debtor personally, but the check denominations ranged anywhere from $5,500 to $16,000.[9]

- In May 2003, the Debtor drew at least three checks totaling $31,500 from New Dimensions' account at Easton Savings Bank. He endorsed and deposited each check into his personal account at the Taunton Federal Credit Union.  A review of his personal account entries disclosed that of the $31,500 deposited, the Debtor withdrew $21,500. *See* Pl.'s Ex. 1.  Significantly, each withdrawal was made on the same business day or shortly after the check cleared.

- Similarly, in August 2003, the Debtor drew at least three checks totaling $20,500 from his business account and subsequently deposited them into his personal account at the Taunton Federal Credit Union.  Of the total deposited, the Debtor withdrew $18,500; notably, each withdrawal occurred almost immediately after the check cleared. *See* Pl.'s Ex. 1.

- In September 2003, the Debtor, once again, drew at least three checks totaling $27,300 from his business account and subsequently endorsed and deposited them

---

[9] Because the Debtor testified that he alone retained withdrawal authority over the New Dimensions' account at North Easton Savings Bank, the Court notes that he wrote the checks out to himself.

into his personal account.  After each deposit, the Debtor made a corresponding

withdrawal on the same business day. *See* Pl.'s Ex. 1.

- In October 2003, the Debtor drew at least two checks from his business account and

  subsequently endorsed and deposited them into his personal account. Of the total

  $30,000 deposited, the Debtor withdrew $29,950. Not surprisingly, each deposit was

  accompanied by a corresponding withdrawal. *See* Pl.'s Ex. 1.

- In total, the Debtor withdrew $97,275 of the $109,325 (approximately 89%) he

  transferred into his personal account over the aforementioned five-month period.

  Because the Debtor's personal account statement merely denotes each withdrawal as

  a "[d]raft," the Court is unable to trace how those monies were spent and the Debtor

  offered no records or testimony of such expenditures.

- Despite his testimony that he never used his business account for personal expenses,

  the Debtor proffered no evidence to explain how these monies were spent.  Instead,

  he suggested that these checks were "loan repayments" for money he previously

  loaned to New Dimensions.  Notably, however, there were no loan agreements

  documenting such an arrangement and no evidence whatsoever of monies the Debtor

  may have loaned to New Dimensions.  Further, the Debtor's Schedule B and SOFA

  did not identify any loans receivable from New Dimensions. Consequently, the

  Debtor's inability to explain how this money was spent only compounds the

  confusion between his financial condition and that of New Dimensions.

Because the Plaintiffs satisfied their initial burden to prove that the Debtor failed

to keep or preserve information regarding his financial condition, the burden shifted to

the Debtor. *See In re Gubellini*, 2009 WL 604953 at *2.  At trial, the Debtor explained

that his wife, and not he, maintained the books and records. When a married couple

shares a duty to maintain records, the Court must consider one spouse's reliance on the

other in determining whether a failure to keep records was justified under the

circumstances. *See Cox v. Lansdowne (In re Cox)*, 904 F.2d 1399, 1402 (9th Cir. 1990).

As a threshold matter, the Court must first determine whether there was a shared duty to

keep records. *See id.* Because she maintained the books and records for all joint and

individual accounts at the Taunton Federal Credit Union, Mrs. Bartel was "inextricably

involved" in the Debtor's financial affairs.[10] *See id.* Thus, Mrs. Bartel shared in the duty

to keep records.

In determining whether the Debtor's failure to keep or preserve records was

justified, the Court should consider all relevant factors, including: 1) the reliant spouse's

intelligence and educational background; 2) experience in business matters; 3) extent of

involvement in businesses for which discharge is sought;[11] 4) reliance on spouse to keep

records, including what, if anything, she was told that indicated spouse was keeping

records; 5) the nature of the marital relationship; and 6) any record-keeping or inquiry

duties imposed on debtor under state law. *See In re Cox*, 904 F.2d at 1403.

Without any evidence of Mrs. Bartel's experience in business matters (or lack

thereof), the Court's analysis focuses on the Debtor's reliance on his wife to keep the

records and the nature of their marital relationship. Admittedly, Mrs. Bartel maintained

the books and records for all household accounts and the Debtor relied on her to do so.

Moreover, there is no indication that the Mrs. Bartel kept their financial affairs secret

---

[10] At trial, both the Debtor and his wife testified that, after their joint account was frozen in May 2005, Mrs. Bartel deposited any paychecks the Debtor received into her individual account at the Taunton Federal Credit Union.

[11] In the instant case, the Debtor does not seek a discharge for either of his two businesses: News Dimensions and DB & Sons Builders Inc. As such, the third factor is irrelevant to the Court's analysis.

from the Debtor, or that she misled him regarding such matters.  There was also nothing

to suggest that Mrs. Bartel would have any records of what the Debtor did with the

money he withdrew from his personal account.  Having completed high school and taken

some college level courses, Mrs. Bartel is a reasonably intelligent woman. Consequently,

the Court concludes that the Debtor's delegation of his duty to maintain records to his

wife was not a sufficient justification to relieve him from responsibility.

Although the Debtor was in some respects a victim of his wife's actions, the

Court finds that the Debtor was an intelligent and educated person. The Debtor cannot

justify his failure to keep books and records because his wife, and not he, was responsible

for their maintenance.  This lack of records made it impossible for any of his creditors to

follow his transactions with any accuracy.  Accordingly, his self-imposed curtain of

ignorance is no excuse.  The Plaintiffs cannot rely on the Debtor's oral representations

concerning the omissions and inaccuracies on the bankruptcy petition and schedules

without also having some independent means of substantiating such representations.

Consequently, the Court can only conclude that the Debtor failed to keep and preserve

records from which his financial condition might be ascertained.  Therefore, judgment

will enter denying the Debtor his discharge under 11 USC § 727(a)(3).

## Commonwealth's Count IV & Acardi and Kenny's Count VI – Failure to Explain Loss of Assets (11 USC § 727(a)(5))

Section 727(a)(5) provides that a Court shall deny a debtor a discharge where the

debtor fails to satisfactorily explain "any loss of assets or deficiency of assets to meet

[his] liabilities."  Section 727(a)(5) is broad enough to include any unexplained

disappearance or shortage of assets.  *See In re Chalik*, 748 F.2d at 618.  Although many

situations that give rise to claim under this section would also fit under one or more of the

other grounds for objecting to discharge,[12] it appears that the element of intent is not

necessary in an analysis under subsection (a)(5).  *See 6* COLLIER ON BANKRUPTCY ¶

727.08 (15th  rev. ed. 2009) (citing *Nof v. Gannon (In re Gannon)*, 173 B.R. 313 (Bankr.

S.D.N.Y 1994)).  As such, a plaintiff need not plead with the particularity required for

allegations of fraud under Federal Rule of Bankruptcy Procedure 7009.  Nevertheless, the

plaintiff must still identify particular assets that have been lost.  *See Ehle v. Brien (In re*

*Brien)*, 208 B.R. 255 (B.A.P. 1st Cir. 1997).

The Court reads section 727(a)(5) in conjunction with Federal Rule of Bankruptcy

Procedure 4005, which imposes on the plaintiff the burden of "proving the objection."

Thus, bearing the initial burden, the Plaintiffs must introduce more than a mere allegation

that the Debtor failed to explain losses.  Once the Plaintiffs have introduced some

evidence of the disappearance of substantial assets, the burden shifts to the Debtor to

provide a satisfactory explanation.  *See In re Chalik*, 748 F.2d at 618.

The Plaintiffs point to two sets of assets that the Debtor allegedly did not

satisfactorily explain the loss of: a) deposits that New Dimensions received for a

construction project at 5 Sonja Maria Way in Easton, MA (the "Sonja Maria deposits"),

property owned by the Plaintiffs Acadi and Kenny; and b) money that was withdrawn

from New Dimensions' business account and deposited into the Debtor's personal

account.  The Court will first address the Sonja Maria deposits and then the transfers

between the Debtor's personal account and New Dimensions' business account.

The Court finds that the Plaintiffs failed to satisfy their burden of proof with

respect to the Sonja Maria deposits.  The Plaintiffs highlight that deposits totaling

$279,400 were paid by Acardi and Kenny to New Dimensions.  By the Plaintiffs' own

---

[12] *See, e.g., In re Lee*, 309 B.R. 468, 478-80 (Bankr. W.D. Tex. 2004).

24

characterization of these deposits and the exhibits admitted at trial, these monies were made payable directly to *New Dimensions*, not the Debtor.  Moreover, there is no evidence that the Debtor deposited these monies into his personal account; thus, it never became his personal property.  There was neither sufficient evidence nor an articulated argument for piercing the corporate veil under which the Court could deem the Sonja Maria deposits as the Debtor's property.  *See supra* at n.1 (indicating that the Plaintiffs' piercing the corporate veil count was not heard at trial).  Lastly, it is the Debtor's property and conduct that is at issue, not New Dimensions'.  As such, not relevant to this Court is whether New Dimensions misappropriated the Sonja Maria deposits by allegedly using them on other construction projects or for general operating expenses of New Dimensions.

In addition to the Sonja Maria deposits, the Plaintiffs allege that the Debtor transferred approximately $109,325 from a New Dimensions' account to his personal account.  As noted above, *see supra* discussion regarding Count III, the Plaintiffs demonstrated that at least $97,275 of the $109,325 that the Debtor transferred into his personal account (over the five month period May 2003 through October 2003) was unaccounted for and seemingly disappeared (i.e., no evidence was proffered as to the use of the money).  Consequently, the Court finds that the Plaintiffs satisfied their burden of proof with respect to the ultimate fate of these assets.

Because he caused the loss and he alone knows what happened, the burden shifted to the Debtor to provide a satisfactory explanation.  *See In re Chalik*, 748 F.2d at 618.  At trial, the Debtor provided no explanation whatsoever, let alone a satisfactory one, regarding how this money was spent.  *See Homes by DeeSign, Inc v. Anderson (In re*

25

*Anderson)*, 350 B.R. 803, 809-11 (Bankr. S.D. Ill. 2006) (denying debtor's discharge because there was no satisfactory explanation of how a $12,500 account withdrawal was spent); *Stapleton v. Yanni (In re Yanni)*, 354 B.R. 708, 716-18 (Bankr. E.D. Pa. 2006) (denying discharge pursuant to section 727(a)(5) because debtor did not satisfactorily explain a loss of approximately $47,259).

In conclusion, the Court finds that the Debtor failed to satisfactorily explain the loss of at least $97,275 of the $109,325 that the Debtor transferred into his personal account. Therefore, judgment will enter denying the Debtor his discharge under 11 USC § 727(a)(5).

## Commonwealth's Count V & Acardi and Kenny's Count VII – Refusal to Obey Lawful Order (11 USC § 727(a)(6))[13]

Section 727(a)(6)(A) provides that a court shall deny a debtor's discharge if he refused to obey any lawful order of the court.  The original burden of proof under this section is on the Plaintiffs to show that there has been a violation of a lawful order of the court. Fed. R. Bankr. P. 4005.

The Commonwealth alleges that the Debtor failed to comply with the Court's Order dated July 28, 2005, authorizing inspection of documents, and the subpoena issued by the Commonwealth on August 9, 2005, seeking production of documents relating to the Debtor's financial condition.  To deny a discharge under section 727(a)(6)(A), any delay or failure to produce documents must be either "intentional" or "willful."  S*ee Riley v. Tougas (In re Tougas)*, 354 B.R. 572 (Bankr. D. Mass. 2006) (citing *Martinez v. Los Alamos Nat'l Bank*, 126 Fed. Appx. 890 (10th Cir. 2005)).  Here, the Debtor's delay or

---

[13] The Court notes that the Commonwealth seeks relief pursuant to 11 USC § 727(a)(6)(A) and (B) whereas Acardi and Kenny only seek relief pursuant to 11 USC § 727(a)(6)(B).

failure to produce books and records was hardly intentional or willful; instead, it appears to have resulted partially from the Commonwealth's own action in executing the search warrant.  This was merely a pre-trial discovery dispute, which was subsequently resolved.  Therefore, it does not rise to the level of a failure to obey a lawful order of the Court pursuant to section 727(a)(6)(A).

Section 727(a)(6)(B) allows a debtor to invoke the privilege against self-incrimination.  A debtor may invoke his Fifth Amendment privilege in response to a material question approved by the court or in response to a request to testify.  The refusal to answer a question on such ground may, but need not, give rise to an adverse inference against the debtor.  *See 6* COLLIER ON BANKRUPTCY ¶ 727.09 (15th  rev. ed. 2009) (citing *Gannett v. Carp (In re Carp)*, 340 F.3d 15 (1st Cir. 2003)).  If, however, a debtor has been granted immunity with respect to the subject matter of the question involved and the debtor refuses to testify on ground of privilege against self-incrimination, the debtor will be denied a discharge. *See id.*

The Plaintiffs direct the Court's attention to the fact that the Debtor invoked his Fifth Amendment right with regard to questions raised during his 2004 Examination and subsequent depositions.  It is undisputed that the Debtor was not granted immunity in this case.  The Court finds that the Debtor was entitled to invoke his privilege.  Accordingly, the Plaintiffs failed to satisfy their burden of proof.  Therefore, judgment will enter for the Debtor under 11 USC § 727(a)(6).

A separate order will issue.

CONCLUSION

Complaint filed by the Commonwealth

Count I, judgment for Plaintiff, the Debtor's discharge is denied pursuant to 11 USC § 727(a)(2).

Count II, judgment for the Plaintiff, the Debtor's discharge is denied pursuant to 11 USC § 727 (a)(4)(A).

Count III, judgment for the Plaintiff, the Debtor's discharge is denied pursuant to 11 USC §727(a)(3).

Count IV, judgment for the Plaintiff, the Debtor's discharge is denied pursuant to 11 USC § 727(a)(5).

Count V, judgment for the Defendant pursuant to 11 USC § 727(a)(6)(A) and (B).

Complaint filed by Acardi and Kenny

Count III and IV, judgment for Plaintiffs, the Debtor's discharge is denied pursuant to 11 USC § 727(a)(2)(A) and (B).

Count V, judgment for the Plaintiffs, the Debtor's discharge is denied pursuant to 11 USC § 727 (a)(4)(A).

Count V, judgment for the Plaintiffs, the Debtor's discharge is denied pursuant to 11 USC §727(a)(3).

Count VI, judgment for the Plaintiffs, the Debtor's discharge is denied pursuant to 11 USC § 727(a)(5).

Count VII, judgment for the Defendant pursuant to 11 USC § 727(a)(6)(B).

Dated: August 10, 2009                          By the Court,

_____
Joel B. Rosenthal
United States Bankruptcy Judge